THE MISSOURI, KANSAS & TEXAS RAILWAY COM-
PANY v. L. T. MERRILL *et al.*
No. 12,553.   (70 Pac. 358.)

KANSAS CITY SUBURBAN BELT RAILROAD COMPANY
v. L. T. MERRILL *et al.*
No. 12,620.

SYLLABUS BY THE COURT.

1. RAILROADS — *Injury to Employee — Liability of Connecting
Lines.*   A railway company which delivers a defective freight-car
to a connecting line is not liable in damages to an employee of the
latter, who is injured by reason of such defects, after the car has
been inspected by the company receiving it.   The loss of control
over the car and over the servants having it in charge relieves the
delivering company from responsibility to the employees of the
receiving company.

2. ———— *Case Overruled.*   That part of the decision in *Railway
Co. v. Merrill*, 61 Kan. 671, 60 Pac. 819, indicated by the first
paragraph of the syllabus, is overruled.

Error from Wyandotte court of common pleas;
WILLIAM G. HOLT, judge.   Opinion filed October 11,
1902.   Reversed.

STATEMENT.

DEFENDANT in error L. T. Merrill, who was plaintiff
in the court below, recovered a judgment against the
Kansas City Suburban Belt Railroad Company and
the Missouri, Kansas & Texas Railway Company for
personal injuries sustained by him in attempting to
pass from a flat or coal-car to a box car in the yards
of the Chicago Great Western Railway Company in
Kansas City, Kan.   He was a switchman in the em-
ploy of the latter company.   The flat car belonged to
the Missouri, Kansas & Texas Railway Company.   It
was loaded with iron pipe at St. Louis and the con-

tents consigned to St. Joseph, Mo. The line of the latter company terminates at Kansas City, Mo.

The car was provided with end-gates, which were held in an upright position by wooden cleats, nailed to the inside of the sideboards on the outside of the end-gates. There were no iron hooks or eye-bolts provided, which are generally used to hold the end-gates in place. Upon the arrival of the car in Kansas City, Mo., it was sent from the yards of the Missouri, Kansas & Texas Railway Company to the yards of the Kansas City Suburban Belt Railroad Company, there inspected by the latter company, placed in a train with about twenty-five others, and pushed a distance of 2000 feet across the state line to a place where cars were usually left to be received by the Chicago Great Western Railway Company. There the car in question was inspected by an inspector of the latter company. The switching crew of the Chicago Great Western Railway Company, of which plaintiff below was a member, then took charge of the string of cars and hauled them to the yards of the latter company and proceeded to make up a train destined for St. Joseph, Mo., and places beyond. Plaintiff below was near the engine on a box car when, in the discharge of his duties, he started toward the rear of the train. Coming to the flat car, he walked over the iron pipe, which was about equal in height to the sides of the car and end-gates. The pipe had been pushed back from the end-gate so that the top of it was about fifteen inches therefrom. Plaintiff stepped with his right foot from the end of the pipe to the top of the end-gate and attempted to cross over to a box car attached. In doing so, the thrust of his body caused the end-gate to give way, and he fell between the cars while in motion. It would seem that the load on the flat car had pushed

the sides outwardly so that the cleats nailed thereto did not hold the end-gate in an upright position, and permitted it to move past the cleats and topple over when stepped on.

*T. N. Sedgwick*, and *Silas Porter*, for plaintiff in error Missouri, Kansas & Texas Railway Company.

*Miller, Buchan & Morris*, and *Lathrop, Morrow, Fox & Moore*, for plaintiff in error Kansas City Suburban Belt Railroad Company.

*Angevine & Cubbison*, for defendant in error L. T. Merrill.

The opinion of the court was delivered by

Smith, J.: The question for consideration is whether a railway company which delivers a defective car to a connecting carrier is liable for injuries sustained by an employee of the latter by reason of such defect, after the receiving company has inspected the car and taken it in charge for transportation over its line. In a former decision of this case, it was held to be within the contemplation of the first carrier that the car would be delivered to another for transportation, and it was also known that connecting carriers employ switchmen to handle such cars, and that their services are necessary in the work of making up trains. It was said:

"With this knowledge, it was the duty of both the plaintiffs in error to provide a car which would be reasonably safe for the service to be performed and for employees of connecting lines to handle, to the end that freight might be expeditiously carried to its destination. . . . Negligence on the part of the Chicago Great Western Railway Company will not excuse the plaintiffs in error either for their failure to inspect, or, having inspected the car, permitting it to be

delivered to a connecting line in a condition which might be dangerous to switchmen and other employees engaged in the practical part of the business of railway transportation." (*Railway Co. v. Merrill*, 61 Kan. 671, 675, 60 Pac. 820.)

We are now fully convinced that the doctrine announced in the former decision on the subject in hand runs counter to an unbroken current of authorities, and fails to stand the test of reason. A critical examination of the cases cited in the former opinion to sustain the view then taken will show that they are distinguishable from the case at bar. We will review some of them.

In *Pennsylvania Railroad Co. v. Snyder*, 55 Ohio St. 342, 45 N. E. 559, 60 Am. St. Rep. 700, there was a traffic arrangement between the different railway companies forming a fast-freight line by which they were to share in the earnings of the transportation in proportion to the distance the car should be hauled over their respective roads. Under the arrangement, the Pennsylvania company, before delivering its cars to the Lake Shore company, agreed to have them properly inspected and put in safe condition for hauling. The car, when delivered to the Lake Shore company to be taken over its road, was defective and unsafe, which proper inspection would have discovered, and prevented the injury caused thereby to an employee of the Lake Shore company. The case differs from the present one. It was argued in the briefs in that case that, by reason of the traffic contracts between them, the two railroads were partners; and it is stated in the opinion that under the arrangement the Pennsylvania company, before delivering its cars to the Lake Shore road, was to have them properly inspected and put in safe condition for hauling. While there is much said in the opinion favorable to the defendant in

error on the question before us, yet the peculiar contractual relations of the two roads as to inspection and payment of the cost of repairs do not exist in this case.

In the case just commented on, *Moon v. Northern Pacific R. Co.*, 46 Minn. 106, 48 N. W. 679, 24 Am. St. Rep. 194, is cited and approved. That decision was given prominence as a precedent in the former opinion in this case. In the Moon case the Northern Pacific and Manitoba railroad companies were connecting carriers and interchanged cars at certain common points under a traffic agreement. According to a rule adopted by the companies, cars received and delivered were required to be inspected by the car inspectors of both on the transfer track, and, if any repairs were needed, they were to be made by the Northern Pacific company before they were transferred and received by the Manitoba company. Accordingly the car was so inspected by the car inspectors of both companies. It was examined by them together and they agreed that it was in good order. Afterward, while the car was being operated by the Manitoba company, the plaintiff's intestate was injured by a defective brake. It was claimed that the brake-staff was defective, and also that the car was not properly or carefully inspected by the inspectors of the respective companies.

It is to be observed that in the Moon case the inspection by the two companies was substantially one act. The Northern Pacific company, through its inspector, at the time the inspection was made, knew that no other or further inspection would be made for the protection of the employees of the Manitoba company. Hence, he is held in law to have anticipated that, if his inspection was careless or negligent, the employees of the Manitoba company would be sub-

jected to whatever dangers should arise therefrom. The court said :

."In this case the inspection by the two. companies was .substantially one transaction, in pursuance of a mutual arrangement under which it was made jointly by the two car inspectors." (Page 100.)

The case of *Heaven v. Pender*, 11 L. R. (p. 503) Q. B. Div. 359, was also cited in the former opinion, and is referred to in *Moon v. Northern Pacific R. Co.*, supra. The facts on which that decision rested were as follows : The defendant, a dock-owner, supplied and put up a staging outside a ship in his dock under a contract with the ship-owner. The plaintiff was a workman in the employ of a ship-painter who had contracted with the ship-owner to paint the outside of the ship, and in order to do the painting the plaintiff went on and used the staging, when one of the ropes by which it was slung, being unfit for use when supplied by the defendant, broke,. and by reason thereof · the plaintiff fell into the dock and was injured. In that case the staging was supplied for *immediate* use, and it was not within the contemplation of the parties that the plaintiff's employer should make an inspection of the appliances to ascertain their fitness prior to their use. It was said by Brett, M. R. :

"It must have been known to the defendant's servants, if they had considered the matter at all, that the stage would be put to immediate use—that it would not be used by the ship-owner, but that it would be used by such a person as the plaintiff, a working ship-painter."

In Beven on Negligence (2d ed.), volume 1, page 62, the author says :

"It is submitted that the principle underlying the decision in *Heaven v. Pender* is that .the dock-owner, having undertaken to supply the staging, thereupon

undertook the obligation to supply a fit staging, which obligation the plaintiff was justified in assuming he would discharge.   Had there been a duty on the ship-owner or on the ship-painter to examine the staging, the chain of connection between the plaintiff and the dock-owner would have been broken.   The decision must, therefore, be taken to imply that there was no duty on the part of any one, subsequent to the dock-owner, to test the staging supplied; but that, when the dock-owner undertook to supply staging, there was an obligation that the staging supplied should be reasonably fit for the purpose for which it was to be used, so that those coming to use it might trust to the performance of the dock-owner's duty without any independent examination of their own.''

In *Savannah Railway Co. v. Booth*, 98 Ga. 20, 25 S. E. 928, the deceased was an employee of a mill located on a railway company's switch.   The latter placed cars on the switch to be loaded by the mill hands, and, by reason of a defect in the car, the employee was killed, and his representative recovered judgment therefor against the railway company, which was sustained.   The railway company in that case se-lected and retained control of the car and placed it in position, knowing the purpose for which and by whom it would be used, thus extending to the injured serv-ant an invitation to use it.   Had the master been a mere hirer, or the company exercised no right as to the selection of the cars to be used, the duty of in-spection would have been upon the master, and, in case of injury to his servant in consequence of his furnishing an unsafe appliance, the loss would have fallen upon him.

A recovery has been denied in cases like the one at bar on two grounds : First, that there is a positive duty resting on the receiving railway company to in-spect the car turned over to it for transportation by

another company, to the end that its employees may
not be injured by defects existing before its receipt;
that the omission or negligent discharge of such duty
breaks the causal connection between the negligence
of the company tendering the defective car and the
plaintiff's injury.   In such cases the failure to inspect
or the negligent manner of doing it is the proximate
cause of the injury to the employee, and the negligence
of the company turning over the unsafe car is the re-
mote cause.   The failure to discharge the obligation
to inspect interposes an independent agency which
severs the causal connection between the company
first guilty of negligence and the hurt.   It was so held
in *Fowles v. Briggs*, 116 Mich. 425, 74 N. W. 1046, 40
L. R. A. 528, 72 Am. St. Rep. 537, a case very similar
to this.   See, also, *Lellis v. Michigan Central R. Co.*,
124 Mich. 37, 82 N. W. 828.

The duty of a railway company to inspect cars of
other roads received by it is enjoined by law.   (*Mo.
Pac. Rly. Co. v. Barber,* 44 Kan. 612, 24 Pac. 969;
*Railroad Co. v. Penfold,* 57 id. 148, 45 Pac. 574;
*Texas & Pacific Railway v. Archibald,* 170 U. S. 665, 18
Sup. Ct. 777, 42 L. Ed. 1188.)

Wharton, in his work on Negligence, section 439,
says:

"There must be causal connection between the
negligence and the hurt, and such causal connection
is interrupted by the interposition, between the neg-
ligence and the hurt, of any independent human
agency.

"Thus, a contractor is employed by a city to build
a bridge in a workmanlike manner, and, after he has
finished his work and it has been accepted by the
city, a traveler is hurt when passing over it by a de-
fect caused by the contractor's negligence.   Now, the
contractor may be liable on his contract to the city for

his negligence, but he is not liable to the traveler in an action on the case for damages. The reason sometimes given to sustain such a conclusion is that otherwise there would be no end to suits. But a better ground is that there is no causal connection between the traveler's hurt and the contractor's negligence. The traveler reposed no confidence on the contractor, nor did the contractor accept any confidence from the traveler. The traveler, no doubt, reposed confidence on the city that it would have its bridges and highways in good order ; but between the contractor and the traveler intervened the city, an independent responsible agent, breaking the causal connection."

The principle above stated is well illustrated in *Carter v. Towne*, 103 Mass. 507. There the defendant negligently sold gunpowder to a child, but the child gave all of the powder to its parents, who afterward allowed the child to take some of it, by the explosion of which he was injured. The defendant was held not liable because the effect of his negligence had been cured by the intervening breach of the child's parents in taking charge of the powder, and their consequent negligence in allowing the child to have it again could not restore the connection between the defendant's original negligence and the final injury.

A second, and, we think, better-founded reason for denying the right to recover in cases like the present is that the liability to a servant ceases with the control of the master over his actions. In *Glynn v. Central Railroad*, 175 Mass. 510, 56 N. E. 698, 78 Am. St. Rep. 507, the plaintiff was in the employ of the New York, New Haven & Hartford Railroad Company, in Connecticut, and was injured while coupling a car belonging to a New Jersey railway company which had a defective coupling apparatus. He sued the lat-

ter company. The court, in holding the defendant not liable, said:

"There was no dispute that after the car had come into the hands of the New York, New Haven & Hartford railroad, and before it had reached the place of accident, it had passed a point at which the cars were inspected. After that point, if not before, we are of opinion that the defendant's responsibility for the defect in the car was at an end. . . . But when a person is to be charged because of the construction or ownership of an object which causes damage by some defect, commonly the liability is held to end when the control of the object is changed.

"Thus, the case of *Clifford v. Atlantic Cotton Mills*, 146 Mass. 47, 15 N. E. 84, just cited, shows that the mere ownership of a house so constructed that its roof would throw snow into the street, and therefore threatening danger as it is without more, whenever snow shall fall, is not enough to impose liability when the control of it has been given up to a lessee, who, if he does his duty, will keep it safe. In the case at bar the car did not threaten harm to any one, unless it was used in a particular way. Whether it should be used in a dangerous way or not depended, not upon the defendant, but upon another road. Even assuming that the car had come straight from the defendant at Harlem river, the defendant did no unlawful act in handing it over. Whatever may be said as to the responsibility for a car dispatched over a connecting road before there has been a reasonable chance to inspect it, after the connecting road has had the chance to inspect the car and has full control over it, the owner's responsibility for a defect which is not secret ceases. See *Sawyer v. Minneapolis & St. Louis Railway*, 38 Minn. 103, 35 N. W. 671, 8 Am. St. Rep. 648 ; *Wright v. Delaware & Hudson Canal Co.*, 40 Hun, 343 ; *Macklin v. Boston & Albany Railroad*, 135 Mass. 201, 206, 46 Am. Rep. 456."

In this case there was no contractual relation existing between the switchmen in the employ of the

Chicago Great Western Railway Company and the plaintiffs in error. They did not employ them and they had no power to discharge them. They could protect themselves against damages resulting to their own servants by reason of defects in the car by giving them notice of its condition, in which event their servants would have the option of assuming the risk or of quitting the service of their employers. There was no relation of confidence between Merrill and the defendants in error. The latter owed a duty to their own servants to see that the cars put in their charge were in a reasonably safe condition and in proper repair, but to extend this duty to every servant of every other railroad in the United States under whose charge defective cars might come would be to formulate a new rule of liability for negligence not sustained by reason or authority.

In *Sawyer v. Minneapolis & St. Louis Ry. Co.*, 38 Minn. 103, 105, 35 N. W. 672, 8 Am. St. Rep. 648, a case in many respects like the present one, the court said :

"At the time of the accident the car was under the management and control of the company operating it, and not of the defendant. It did not come to the hands of the plaintiff through the agency or by the authority of the defendant, and there is no privity between them. It owed him no duty growing out of contract, and was not bound to furnish him safe instrumentalities. As to the defendant, the plaintiff was a mere stranger." ( Citing authorities.) "The liability of the defendant in respect to the condition of its cars did not extend beyond those to whom it owed some duty by reason of its relation to them as master, employer, or carrier. Any other rule would be found impracticable of application in ordinary business operations."

A railway company might have occasion to send a

train of defective cars from San Francisco to Boston for repairs, to be hauled over several lines of road. Its own servants, knowing their bad condition, would use a high degree of care to avoid injury from them, but, under the theory of counsel for defendant in error, unless the company forwarding them gave express notice of their condition to every railway employee of the several roads transporting the cars, it would be liable for damages to them in the event that they were hurt by reason of such defects.

In *Winterbottom v. Wright*, 10 Mees. & Wels. 109, 114, the defendant had contracted with the postmaster-general to provide a coach for carrying the mail, and agreed to keep it in repair and fit for use. Other persons had a contract with the postmaster-general to supply horses and coachmen for conveying the coach. The vehicle broke down and injured the driver, by reason of the negligence of the defendant in failing to keep it in proper repair and fit for use. Lord Abinger said :

"There is no privity of contract between these parties ; and if the plaintiff can sue, every passenger, or even any person passing along the road, who was injured by the upsetting of the coach, might bring a similar action. Unless we confine the operation of such contracts as this to the parties who entered into them, the most absurd and outrageous consequences, to which I can see no limit, would ensue."

So, a gas-fitter was held not liable for damages for negligently hanging a chandelier in a public house, knowing that it would likely fall on plaintiff and others, unless properly hung. It fell and injured the plaintiff. The court held that he had no cause of action because the declaration did not disclose any duty by the defendant toward the plaintiff for the breach

of which an action could be maintained. (*Collis v. Seldon*, L. R. 3 Com. P. 495.)

In *Heizer v. Kingsland & Douglass Mfg. Co.*, 110 Mo. 605, 614, 617, 19 S. W. 633, 15 L. R. A. 821, 33 Am. St. Rep. 42, a servant of the purchaser of a steam-boiler was injured by the explosion of it. He sought to charge the manufacturer of the boiler, and alleged that the latter, when he sold it, warranted it to be free from defects and of first-class material; that the cylinder was made of poor material, was defective in construction, and too weak to stand the ordinary strain, all of which defects were known to the defendant's agents at the time of sale, and by reason thereof the explosion occurred. The court, in denying a right to recover, said:

"Wharton thinks the better reason for the rule is that there is no causal connection between the negligence and the hurt; but be this as it may, the rule itself is well established in England and in the United States, and we think the case in hand comes within it. It is true the defendant must have known, when it made and sold the machine to Ellis, that other persons would be engaged in operating it; but this is no reason why defendant should be held liable to such other persons for injuries arising from the negligent use of poor material or for defective workmanship. Such knowledge must have existed in the cases which have been cited as asserting the rule, and would have been as good an argument against the rule in those cases as in the case in hand. . . . The plaintiff's case tends to show no more than negligence, and an action based on that ground must be confined to the immediate parties to the contract by which the machine was sold. To hold otherwise is to throw upon the manufacturers of machinery, not necessarily dangerous, a liability which, in our opinion, the law will not justify."

In the case quoted from, a large number of authori-

ties, both English and American, are collected, which sustain the principle announced. See, to the same effect, *Necker v. Harvey*, 49 Mich. 517, 14 N. W. 503; *Losee v. Clute et al.*, 51 N. Y. 494, 10 Am. Rep. 638; *Bragdon v. Perkins-Campbell Co.*, 87 Fed. 109, 30 C. C. A. 567.

One of the principal reasons given in the former decision in this case for holding plaintiffs in error liable was that they knew that this defective car, after it left their hands, must be switched about and put into trains of connecting roads by switchmen employed by the latter, and, with such knowledge, they were negligent in permitting it to go into the charge of such railway employees in a defective condition. In the many cases cited and quoted from above, it was equally well known by the manufacturer of a defective machine, like an elevator, for example, that employees of the purchaser would be called on to use it, yet, there being no privity between the maker of the machine and the vendee's servants who were injured by it, there could be no recovery by the latter against the manufacturer or builder. (*Heizer v. Kingsland & Douglass Mfg. Co.*, supra.)

If responsibility for defects in this car is to be fixed on the two railways or either of them, then the application of such a rule of liability must of necessity be extended to cover the case of a brakeman injured by a negligently constructed car-wheel, and permit a recovery by him of damages against a foundry company which cast and furnished the wheel and sold it to the railway company; for it is within the contemplation of the manufacturer of car-wheels that they will come into the charge and control of the servants of the railway companies using the cars. If such wheels are negligently constructed, the contemplated purpose of

their future use being manifest, the liability of the maker would follow that use everywhere, whenever they happened to cause injury to a railroad employee operating them. This liability of the maker could not be defeated by the fact that the defective appliances might have changed ownership and control many times after their first adaptation to railway purposes. As we have seen, the liability of negligent parties so far removed from the injury as the manufacturer in the supposed case finds no support in the authorities.

The defective car was not inherently dangerous. It was the manner of its use which caused the injury. The two railway companies that handled the car before its delivery to the Chicago Great Western Railway Company cannot be held to that strict account which the law imposes on one who negligently delivers poisonous drugs to another, imminently dangerous to human life, which fall into the hands of third persons to their injury.

In *Roddy v. The Mo. Pac. Ry. Co.*, 104 Mo. 234, 247, 15 S. W. 1114, 12 L. R. A. 746, 24 Am. St. Rep. 333, it was said:

"It cannot reasonably be contended that a railroad-car, though supplied with defective brakes, is an imminently dangerous instrument. Unless put in motion it is perfectly harmless, and when in motion it is not essentially dangerous."

In *Mastin v. Levagood*, 47 Kan. 36, 42, 27 Pac. 124, 27 Am. St. Rep. 277, it was said:

"There is a marked distinction between an act of negligence imminently dangerous and one that is not so; the guilty party being liable in the former case to the party injured, whether there was any relation of contract between them or not, but not so in the latter case." (See, also, *Glynn v. Central Railroad*, supra.)

Counsel for defendant in error have invoked the
rule *stare decisis*, and insist that the former decision
must govern on the second appeal.   This would come
to us with more force if we were not now considering
the same case with the same parties before the court.
If an erroneous decision has been made, it ought to
be corrected speedily, especially when it can be done
before the litigation in which the error has been com-
mitted has terminated finally.   We are fully satis-
fied that the rule of the former case is shattered by
the pressing weight of opposing authority, and that
reason is against it.   In *Ellison v. Georgia Railroad
Co.*, 87 Ga. 691, 13 S. E. 809, the learned Chief Jus-
tice Bleckley used the following forcible language :

''Some courts live by correcting the errors of others
and adhering to their own.   .   .   .   Minor errors,
even if quite obvious, or important errors if their ex-
istence be fairly doubtful, may be adhered to and re-
peated indefinitely ;  but the only treatment for a great
and glaring error affecting the current administration
of justice in all courts of original jurisdiction is to
correct it.   When an error of this magnitude and
which moves in so wide an orbit competes with truth
in the struggle for existence, the maxim for a supreme
court, supreme in the majesty of duty as well as in
the majesty of power, is not *stare decisis*, but *fiat jus-
titia ruat cœlum.*''

The judgment of the court below will be reversed,
with directions to enter judgment on the finding of
the jury in favor of the defendants below.

All the Justices concurring.

Doster, C. J. (concurring specially) :  I believe
we were in error in the former determination of this
case, and, therefore, concur in the decision now made.
However, I do not believe that our present judgment
can be rested on the theory of the breaking of causal

connection between the negligent acts of the railway company delivering the defective car and the one receiving it, caused by the latter's failure to inspect, or the making by it of an ineffective inspection. A failure to inspect, or a careless inspection, either one, was a simple failure to do a duty—an omission, not an affirmative act of wrong-doing—and I think the breaking of causal connection between a series of negligent acts is accomplished only by the doing of something by somebody else which operates as a new and independent producing cause, diverting the first negligent act from its natural end, and giving it a direction and force it would not otherwise have. It is not philosophical to speak of causal connection between act and consequence being broken by a mere failure, though a negligent one, of some person, not the original actor, to do something. Causal connection is broken only by the intervention of active agencies, not the occurrence of passive conditions and qualities.